Case No. 20-1933. It is an appeal from the District Court in the Northern District of West Virginia. Mr. Lee, I understand you want three minutes for rebuttal? That's correct, Your Honor. Thank you. Okay. You may proceed. May it please the Court, this is Bill Lee again on behalf of Biogen. As the panel knows, the only issue in this appeal is whether the asserted claims of the 514 patent are invalid for lack of written description. As this Court said in Alcon, written description is about whether the skilled reader of the patent disclosure can recognize what is claimed and what is described. What is claimed is a method for treating MS by administering 480 mg per day of DMF. This simple claim is disclosed expressly in the specification, and I'd like to turn to that specification, if I could, and then turn to the legal errors we believe the District Court made that led it to the incorrect result. Well, Mr. Lee, I understand that your argument is that the Court improperly applied our blazemarks type of cases with respect to Method 4. Is that correct? Yes, Your Honor. All right. Does the blazemark analysis apply to the portion of the spec that shows up in Column 18? Yeah, Your Honor. Actually, I don't think this is the blazemarks case. I think this is an If you take the claim, which is a method, Method 4 is a method of treating MS, the specification specifically describes Method 4 as a method of treating MS with a compound, DMF, by administering a therapeutically effective amount, then when you get to Column 18, if you read the specification from the beginning at Column 1 through claim Column 18, which Your Honor has just identified, the range, one of the ranges for a therapeutically effective amount includes 480 milligrams per day. So this is actually not a blazemark case like a new-assigned case where you have this extensive, overwhelming genus, and you're trying to identify a point within the genus. This is a specification where the focus from the very first sentence of the specification is on MS. This is a specification that says you can treat MS and you can treat the hallmark characteristics of MS with DMF. This is a specification that says you can treat MS with DMF in a therapeutically effective amount. And then you get to Column 18, and that's where the range, the nested range, and the narrowest nested range of 480 milligrams per day to 720 milligrams per day is specifically identified. And if you look in Column 18, Your Honor, at portions that were not cited by the district court, not considered by the expert, Dr. Greenberg, at all, you will see that in the Column 18 immediately above the nested ranges, the reference is specifically to a therapeutically effective amount. Now, that's important, as the panel knows, because therapeutically effective amount is a limitation of the claims. With the exception of one independent claim, there's no real argument. I do not believe that that claim should be dealt with differently. Therapeutically effective amount is a limitation of the claims. In Column 5, it is a concept that is specifically defined. It is specifically defined as treating the hallmark characteristics of MS, and it is specifically what ultimately culminates in the 480 to 720 milligrams per day dose in Column 18. And the person of ordinary skill in the art with all of that, Your Honor, reading from the beginning... Mr. Lee, this is Judge Hughes. Can I just interrupt you here? Sure. I get this. I've read this passage. I get your argument, but at the end of the day, isn't this a factual conclusion by the district court, and we have to determine whether our reading of this passage makes the district court's decision clear air? And if it was just a... Can I just... Let me just finish. I know this is hard to do by phone and without the visual signals. I wish we were doing video. If this were just a passage about 480 to 720, I would be there with you. That would be easy. But it has a bunch of different ranges, and at the time, everybody knew that 720 worked and 360 didn't work, right? So some of these ranges have things that work and don't work, and then it turns out that one of them has things that all work. How do we know that it was specifically understood that 480 would work when we have overlapping ranges where things don't work? So, Your Honor, I apologize. I thought you were done your question when I started to wade in, and you're right. It's the problem without being able to see visual cues. So let me say the following. I think, again, I would make these three points. One is, you have to read that portion of column 18 as the culmination of a progression that starts in column 1, line 1. If it's read that way, you understand then that you're talking about a therapeutically effective dose, and the therapeutically effective dose as claimed in the limitation and is described in column 5. So that's a critical portion of the analysis. You then have these nested ranges, and the narrowest nested range is 480 to 720, and one of ordinary would know that the 720 is effective, and they would know that the PET is saying that 480 to 720 is effective. And the reason that's important, my second point, is this, Your Honor. The 480- Can I just, before you move on to that second point, but let me follow up on that. This is where I have the problem, though. Again, I agree with you if that was the only range, and that would be okay, but by the logic you just said, if a skilled artisan would know 720 is effective, that range would be effective. Well, why wouldn't that same logic apply to the 240 to 720 milligrams per day? And a skilled artisan would then, by that logic, assume that all of that would be effective, which we know is not correct. And, Your Honor, this is why, to go back to where I started, this is why the fact that this is the narrow issue of written description is so important, because this court, the predecessor court, and this court have addressed this issue of whether inoperative embodiments can somehow affect the question or the issue of whether an operative embodiment is, in fact, disclosed. And the Schnitzer case, which we have cited, which remains good law, says, look, the fact that there are inoperative embodiments that are identified in the specification does not mean that an operative embodiment is not disclosed. And, in fact, the inoperative may go through. Mr. Lee, so is it your position, then, that the 240 is an express disclosure? It just doesn't happen to be operative? Yeah, Your Honor, I think if it were the 240 that were an issue, I think that there would be an express disclosure of 240, but it would not be enabled. And that's why I think it's critically important that the issue here is just written description. And one of the errors, as the panel knows, that we believe the district court made is it collapsed concepts of obviousness, written description, and enablement. If the patent said expressly that 240 was a therapeutically effective dose for the treatment of MS, it would be disclosed, but it would not be enabled. There's no question here that this 480 milligram per day dose is enabled. And there's a reason, and the reason's in the district court's opinion. The 480 milligram per day dose was actually conceived by Dr. O'Neill, conceived and documented before the filing of the provisional application. And I think as the panel knows, from the opinion of the district court, this range of 480 to 720 that Judge Hughes has asked me about was not a coincidence. These were the phase two, phase three numbers, the doses that were going to be tested in phase three, as the district court says. And in fact, within a month after filing of the application that had this range of 480 to 720, the phase three started without the dose. What about the fact, I mean, does it matter that Dr. O'Neill said that he conceived of it, but he wasn't positive it would work at the time of the application? Not for written description purposes, Your Honor. And the question is, again, for written description purposes, is disclosure. Is there disclosure of what is and there is a disclosure of the monotherapy treatment method for at 480 milligrams per day, and that's sufficient. And to go back to Judge Hughes's question, the third point I would make is this. There are a series of nested ranges in column 18, all of which follow three independent references to therapeutically effective amount. There is an effective dose in every single one those ranges. And when you get down to 480 to 720, it is saying expressly that is effective ranges in those endpoints are effective. So if we ask ourselves, and I think if you go back- Sorry, Mr. Lee, can I follow up on that? Then are you saying in these other ranges, the low endpoint is effective for something? Your Honor, the fact of the matter is the specification describes other disease conditions, and it's not part of the record, and I'm not representing to you now that those other ranges might be or might not be effective for those other disease conditions. You're not going to get an argument from us that when it talks about 240 to 720, we're not claiming that 240 was effective. We're saying that as a legal matter, the fact that there were inoperative species or inoperative doses under Smither- No, no, I get that, but I just thought what you were just saying right before I asked the question was that these ranges all corresponded to effective ranges for something. I just didn't see that explicitly tied anywhere in. If that's what I communicated, that's not what I intended to communicate, Your Honor. What I intended to communicate is each of those ranges had a dose, 720, that was known to be effective to a person of orgasm on the arts as a result of the phase two trial. What is the point of the distinction between therapeutically effective, which I understand is an actual claim limitation and a defined term, and clinically effective? It's a great question, Your Honor. The therapeutically effective is defined and specifically defined as treating one- You can finish that. Yes. It's specifically defined as treating one or more of the characteristics that are hallmark characteristics of MS, but also could be characteristics of other neurological diseases. That is a threshold level of efficacy. I think as the panel knows from your consideration of other life sciences patents, it is often true that the patent, the invention is discovered, a compound, a method of treatment, it's known to have a threshold level of efficacy. But then when it goes into phase three, when it goes into the clinic, what turns out to be true is it has much greater clinical efficacy than the threshold level of therapeutic efficacy. The patent requires, as you would think as a matter of logic, that there be a threshold level of efficacy. In fact, there was and is. But then when it went into phase three, and there were tests of the 480 and 720 across a whole series of not only radiological endpoints and clinical endpoints, the unexpected results or the surprising results were that that dose, which had demonstrated, which had and was represented to have a threshold level of efficacy, in fact, had this surprising clinical efficacy across all of the radiological endpoints, across all of the clinical endpoints. And it was as effective across all of those endpoints as the 720 milligram per day dose. And that's precisely what the experts said. The last thing I'll say in answer part of this question, but also a question that Joe Gremelli asked about the experts, this isn't just a question of what the expert says, because the predicate of Dr. Greenberg's testimony, which was the predicate of Mylan's attack on the patent and the predicate of the district court's opinion, the fundamental proposition that he offered did not consider the key claim limitation of therapeutic efficacy at all. And as a consequence, it's just legally insufficient to satisfy their burden. Where in the patent- Joe Gremelli, may I ask a question? Yes, of course. Yes. Counselor, where in the patent do we see anything regarding the efficacy of the 480 dose? I look and I do see significant reference with very specific references as to what was an effective dose in the February 2007 priority date for the 720 dose. That does have specific references to efficacy, but I don't see that with respect to 480. And it seems to me you're using this anchoring argument. You're saying since it's in the same range, it doesn't have to have, the specification doesn't have to have any specific references as to efficacy. But then if that's the case, how do we evaluate that with respect to the February 2007 priority date? Your Honor, I think that the answer is in column 18 and I'll be brief. At column 18, line three, you'll see a reference to a therapeutically effective dose. You'll see it repeated in the same column at line 16, and you'll see it again repeated at line 39. With that as the backdrop, because what column 17 and column 18 are talking about are the mechanisms for determining a therapeutically effective dose. And then when you get to column 18, the culmination of that is for DMF, which is the compound we're considering, an effective amount can range from. And then the narrowest range is 480 to 720 milligrams per day. Was a 480 dose subject to clinical testing in 2007? No, Your Honor, it was part of the phase three. And that's why the Alcon case, and I'll end on this because this is where I began. In the sentence that follows the portion of Alcon that I quoted at the outset of the argument, the very next sentence says, it is not about whether the patentee has proven to the skilled reader that the invention works or how to make it work. And that's because that's the enablement question that Judge O'Malley was asking me about. Thank you, Your Honor. Okay. Mr. Lee, we'll restore your three minutes for rebuttal. And Mr. Anstead, if he needs another three minutes, we'll give it to him as well. Thank you. Thank you, Judge O'Malley. And good morning, Your Honors, and may it please the court, this is David Anstead representing Milan. Because Biogen is on the wrong side of the district court's factual findings and credibility determinations, its appeal presents what Biogen contends are a handful of legal arguments. But in reality, and I think it's been borne out by the discussion this morning, Biogen is simply trying to re-argue the facts. All the asserted claims narrowly require the use of a 480 milligram dose of DMF to treat MS. But that 480 milligram dose of DMF is mentioned precisely once in the entire 30-column patent specification in column 18, and it's not connected to the treatment of MS or any of the dozens of other neurological diseases that the specification deals with. So the issue at trial was whether a specification, in light of her background knowledge of the prior art, would make the connection between the precise 480 milligram dose mentioned once in column 18 and an effective MS treatment as claimed. Well, counsel, let me ask you something that I started with Mr. Lee with. Because I understand the court's consideration of Blasemark's analysis for purposes of seeing if method four is tied to MS. And frankly, it doesn't seem like a difficult leap to conclude that it is. So the question is, once you believe that that is, that there is a connection between method four and the treatment of MS, why doesn't the question of column 18 just simply devolve to an expressed disclosure? A few answers to that, Judge O'Malley. First of all, even if you accept the proposition that method four mentions MS, it doesn't explicitly mention MS. That never happens in the specification. What they argue is that it mentions demyelination, axonal loss, and neuronal death, which are kind of what they characterize as the hallmarks of MS. But even if you accept that method four mentions MS, the problem is method four mentions all of the neurological diseases that are treated or that are dealt with by the specification. And there are three dozen of them. And that's equally true of the definition of therapeutically effective dose. Biogen likes to kind of treat that as if it starts with the words demyelination, but it doesn't. They have to excise the vast majority of that definition, which plainly deals with all the neurological conditions. But the fact that it deals with more conditions doesn't change the fact that it deals with this particular condition, does it? Here the issue, I think, Judge O'Malley, is when you get to column 18, if we accept the fact that method four and the dozens of diseases, and MS is one of them, that's absolutely right, then comes the question, we get to column 15, which is the only places that the dose ranges are disclosed. And this was a... In column 18. In column 18, yes, in column 18. And this was a hotly disputed issue at trial because if you look at that sentence in column 18, it says the following doses, quote, can be effective. It doesn't specify any of the neurological diseases, and then it goes on to list four ranges, 100 to 1,000 milligrams, 200 to 800, 240 to 720, and then 480 to 720. Now, Dr. Nguyen, who was Biogen's expert, was examined about this, was cross-examined about this. And he said, under cross-examination, well, the skilled artisan, with their background knowledge of the prior art, reading the specification, when they come to this passage at column 18, lines 58 to 62, they would not regard 100 to 1,000 milligrams to be a range for MS. They would not regard 200 to 800 to be a range for MS. They would not regard 240 to 720 milligrams to be a range for MS. He testified that that was the skilled artisan's belief, reading the specification. And so the issue then became- Well, I don't- Is that exactly what he said? I thought what he said was he wouldn't know- you wouldn't know what is the preferred clinical efficacy as it relates to those ranges. I think that's respectfully incorrect, Judge O'Malley. And if we look, starting at appendix page 1542, and this is Dr. Nguyen's examination. And so he's asked, starting at line 19 on appendix 1542, Dr. Nguyen, reading this patent specification and view of the prior art at the priority date, you would not have expected a dose range of 100 milligrams to 1,000 milligrams of BMS to be effective in treating MS. Is that right? His answer, that's correct. Then we go on to appendix 1543, and he's asked essentially the same question about 200 to 800 milligrams. And he says, correct. The only dose that I would know prior to reading the patent would be the dose of 720. And then he goes on to 240. Prior to reading the patent. Prior to reading the patent. But then he says, and then he's asked, in reading the patent specification at the priority date and view of the prior art, this is the 240 to 720 we've moved on to now, you would not have expected a dose range of 240 to 720 milligrams of DMF per day to be effective in treating MS. Correct? And he would say, I would not expect a lower estimate of the range to be effective. That's correct. And then on the next page, appendix 1544, and this is the issue that Judge Hughes was raising, he's asked, he's asked now, and this is at line nine, now in one of these three ineffective dose ranges, a 240 milligram per day dose is to a 720 milligram dose, right? But you don't think a field artisan reading the patent applicant would believe a 240 milligram dose would be effective to treat MS despite that you're referring to, Judge O'Malley, comes a little bit later when Dr. Wynn kind of backtracks. And he says, well, actually, I don't know that these three dose ranges that he had just said would be regarded as ineffective. Maybe they would have some effect of MS. I just don't know if they would be ideal or preferred. And that was a complete reversal of what he had just testified to. And the district court watched all this unfold live and understandably, in her opinion, decided not to credit Dr. Wynn's testimony. But what do we make of the fact that just in terms of what the law requires, we have to keep in mind that there are distinctions between written description enablement and distinctions between obviousness and written description. So in other words, you don't have to show efficacy to prove written description if you actually contain the language calling it out, right? I would slightly disagree with that, Judge O'Malley, and here's why. First of all, the question throughout all of this court's written description precedence is does the field artisan reading the patent specification understand with reasonable clarity that the inventors actually possessed the claimed invention? And that was a question of fact that was presented to the district court. And so the claims require a therapeutically effective amount of DMF of 480 milligrams. And so the question is, is the skilled artisan who comes to the specification, do they understand based on it that the inventors actually possessed that? And that was the factual question that the district court decided in Mylan's favor. So in other words, if there's skepticism with respect to what it is you're claiming, then you haven't described it? No, no, it's not that principle at all, Judge O'Malley, and we are certainly not advocating for that kind of principle. The issue is, and it was undisputed between the parties, that for written description purposes, the patent specification is read in light of the skilled artisan. And it was undisputed, this was Biogen's own testimony, it's in their blue brief at page 57, that the skilled artisan coming to this patent specification would expect that 480 milligrams would not be an effective dose, effective period at any level of efficacy in MS. And in the blue brief at page 57, Biogen acknowledges that. They say the skilled artisan picking up this specification wouldn't expect 480 to be effective as efficacy is defined in the patent specification. Dr. Wynn, in his cross-examination, admitted the same thing multiple times, that's in appendix 1523, 1524, 1527, and he even went so far as to say even the 720 milligram dose would have been viewed by the skilled artisan at the priority date as lackluster, that was his word, that's at appendix 1551, and that the skilled artisan would have been interested in looking at higher doses than 720 milligrams. Counsel, this is Judge Hughes. I have a couple hypotheticals, if I might. If instead of the ranges we have in the specification, we had instead, you know, is either 480 and above or at 720, would that change the result? Because it seems like then every range and everything else is the same. There's no direct connection to MS, all that kind of stuff. At least then it would seem that everything was in a range that skilled artisans might have known would work or eventually thought would work. Judge Hughes, I would agree with you if the range started at 720 milligrams and went up. Okay. Yeah. Address the 480 to 720 range, if that's in there, because I think that's really what Mr. Lee is talking about, is that, you know, that is an effective range, as we all now know, and why isn't that enough? Well, and I think you see that we all now that. And we now know that range, including 480, is effective because of the phase three trials that were released in 2011. And this goes back to Judge Reyna's question, which was, was there any evidence in 2007 at the priority date that 480 milligrams would be effective? And I think my friend on the other side answered candidly, no, there wouldn't have been. But taking your hypothetical, Judge Hughes, if we were to actually... Yes. Sorry, I just wanted to stop, though, because this is where I'm a little confused about whether we're really still talking about written description or we're going into enablement, that if the ranges disclosed are things that are written descriptions of precisely the amount claimed, then why isn't that now an enablement problem that it wasn't enabled at the time, rather than a written description problem? It's a written description problem, Judge Hughes, because this Court's case is just to hold that to have adequate written description, the four corners of the specification, you know, being read by the skilled artisan, have to convey with reasonable clarity, actual possession of the invention. And so I'll take this two ways. One, as the specification's written, and one with your hypothetical. And as the specification's written, I think as you pointed out, we have this problem that in this single sentence, where the 480 to 720 ranges, we've got three dose ranges, as the District Court found, that the skilled artisan, and the Biogen admits, that the skilled artisan would regard as ineffective in MS. And so then the question became, why would you say, first one, second one, third one, these can't be about MS, oh, but this fourth one is. And as I believe Judge Rayna pointed out, the Biogen theory was this anchoring theory. Well, 480 is anchored to the known 720 milligram effective dose. Of course, that was completely undercut when Dr. Wynn admitted that so was 240 milligrams, but the skilled artisan wouldn't regard that as effective. Now, in your hypothetical, if we were to say, cut out the first three dose ranges from column 18, and so we don't say 100 to 1,000, 200 to 800, 240 to 720, and we start with 480 to 720 and then maybe go higher, it's counterfactual, of course, but I think there would still be a problem. That was effectively the situation in NUVO. In NUVO, there's no dispute that there was an express disclosure of the claims invention, an uncoded PPI that was effective to raise gastric pH. But as the NUVO court recognized, this court's precedents say that an in ipsis verbis recitation of the claim language in the specification isn't necessarily enough. But in NUVO, there was a very important distinction, wasn't there? And that is that the patent itself said that the uncoded wouldn't work. It went on to claim it, but it expressly stated that it didn't work. I would respectfully, Judge O'Malley, say that that is a distinction without a difference. There's no dispute that for written description purposes, the patent specification is read from the perspective and with the background knowledge of the skilled artisan. So whether the knowledge that a dosing regimen or a dose is not going to be effective is stated in the specification, it's the same. It would be quite odd to suggest that the skilled artisan's belief doesn't matter for written description purposes unless it's memorialized in the patent specification. And what this court said in NUVO was that based on the specific facts of certain cases, it's unnecessary to prove that a claimed pharmaceutical compound actually achieves a result. Our case law provides that that result must be supported by adequate disclosure in the specification. And just as in NUVO, here, the skilled artisan comes to the specification thinking 480 milligrams is not effective. And the factual question, again, for the district court, who watched the party's two experts, who watched the two inventors testify, was, is that sole reference to 480 in column 18, not linked to MS, in a sentence with three other dose ranges that the skilled artisan reading the specification would believe would be ineffective in MS, is that enough of a blaze mark to convey actual possession? And she found that the answer to that was no. And that is not a clearly erroneous fact finding, we submit. Counsel, this is Judge Hughes again. I want to just ask you one more hypothetical. Sure. And just change just two key facts. Instead of a patent directed to a bunch of different diseases, this one is solely directed at MS. And then in the ranges, instead of all these different ranges, the only range is the 240 to 720 range. Everything else is the same. We know that 360 doesn't work. When the only range includes both some that work and some don't work, and there's a limitation on, I guess, therapeutical efficacy, would that have disclosed a 480 dosage? I don't think it would, Judge Hughes, and here's why. So the hypothetical is, we get rid of all the three dozen other diseases, we get rid of all the dose ranges so we just have 240 to 720, but we still have the skilled artisan's background knowledge coming to the specification that that 240 milligram dose doesn't work, that another dose within that range, 360 milligrams, doesn't work in MS. And so the question then becomes, the specification has to somehow convey, notwithstanding that background knowledge to the skilled artisan, that 480, another dose picked out of this range, works. And they could have done that. They certainly could have put in the specification information that would show that, yeah, in fact, we think that 480 milligrams would work, but they didn't. Well, can I ask you about that then? Because I'm a little confused about the kind of dividing line between when you're allowed to claim a range that has both workable and non-workable dosages, and when it's a sufficient written description when that range is in effect, and what you have to do to have blaze marks. Because, you know, under the hypothetical, it seems pretty pinned down. This is only for MS. Here's a fairly limited range, even though some of it ultimately doesn't work. You know, we're claiming everything in the range that does work. And, you know, the way you're answering this seems to suggest that the only way you're going to have a written description is if you actually call out the specific dosage amount. And it doesn't seem to me that that's our law. Well, and I think, and if I could, if I may just answer that question. Yes, you may, of course. Okay. Thank you. And I think this gets to the argument that my friend, Mr. Lee, was making about inoperative embodiments and citing the Snitzer v. Edsel case. And I want to be clear that Mylan's argument is not that the disclosure of inoperative embodiments negates the disclosure of operative embodiments for written description purposes. Mylan's argument is that there are no blaze marks at all to an effective method of treating MS with 480 milligrams of DMF. There is no adequate disclosure in the patent specification of an operative embodiment, period, full stop. And Biogen's reliance on Snitzer is completely off point if you look at the facts of that case. In Snitzer, the specification described 14 specific ions for single specific use, activating a laser. It was undisputed in Snitzer that the claimed ion was described for that precise purpose and it worked for that purpose. But several of the other ions were eventually found not to work. And that didn't result in a lack of written description. The facts here are entirely different. Snitzer was not a blaze marks case. It was undisputed that the claimed embodiment worked and that it was described. The use of the claimed ion was expressly disclosed for the specific claimed purpose. And unlike Snitzer's express disclosure of the claimed ion for a single specific purpose, the specification here discloses the possible use of DMF or a host of other drugs in dozens of different neurological diseases. And the specification's lone reference to 480 milligrams is not tied to any of those specific diseases. And again, the Snitzer debate here is kind of, again, a fact question. A fact question about whether there were sufficient blaze marks. And again, the district court, who sat through four days of trial, watched both of the parties' experts, heard from both of the inventors, made the factual finding that it doesn't. And it's our position that that certainly cannot be, on this record, found to be clearly erroneous. And unless there are any other questions, I'll, I believe that's all. We'll hear from Mr. Lee. Thank you, Your Honor. Let me make four points. The first is this. The suggestion that Method 4 is not tied to MS, which is actually a foundation of the argument that Mylan made below, and at 829, a foundation of the district court's opinion, is simply wrong on the express language of the patent. At column 3, lines 1 to 4, and 14 to 16, and column 16, lines 19 to 26, the methods described are specifically identified, 1 through 5, as applying to MS. And the only monotherapy in the 5 methods is Method 4. So this is not a question of blaze marks tying Method 4 to MS. There's an explicit disclosure. Point 2. Nouveau is a different case and a distinction where the difference is significant. In Nouveau, the specification suggested that uncoated PPIs would not work. And the knowledge of an organization called Neillard was affirmatively that uncoated PPIs would not work. That is not what's at issue here. And in fact, when... Counselor, this is Judge Reina. I think what is at issue here is whether the specification contains any evidence of the efficacy of the 480 dose. Can you point where in the specification I have specific evidence regarding the efficacy of the 480 dose at the time of the filing in February 2007? So, Your Honor, I think the answer to that question is in two parts. The specification... And I'm not referring to your anchoring argument. I want to get to the non-attorney argument, and I want to get to specific evidence in the specification. Yeah, no, I understand your argument. And Your Honor, if I'm misstating it, just tell me. Column 18 says expressly that 480 is effective. That's all that's required for description. There's no requirement that there be any evidence that is, in fact, effective. And that's what Alcon says. Now, for sure, Your Honor, if there was an enablement challenge, then that would be... Doesn't that column say the 480, it includes it in a range, but within that range, there's also other doses that are not effective? There's nothing in the record that indicates that there are doses between 480 and 720 that are not effective. So, Your Honor, I think the answer to that question is in three parts. The words that 480 is effective, and it's not in a range. 480 specifically identified is there. There is not the information, I think that Your Honor is asking about, that says here's the proof that it was effective. But the argument we're making is for written description that that is not necessary. And at the end of the day, that's the distinction from NUVO. Could I just one last point, Your Honor? Yes. Okay. To take counsel's last argument about the importance of the experts, this is not just a battle of experts. There are legal issues here. And the legal issue is, can an opinion from an expert that doesn't most critical claim limitation be legally effective? The answer is it cannot be. If there was an opinion, an infringement that didn't consider the key limitation, it wouldn't be. It can't be because it's based upon a judicial estoppel argument that isn't articulated by the court or correct. And then lastly, this idea that Dr. Wynn gave away the keys to the kingdom, if Your Honor just consider, if the panel just considers what the court said at page 31 of the appendix, it dismisses Dr. Wynn only because he could not say that these doses were the most effective or preferred. And again, that might be relevant to another issue, but it's not relevant to written description. Thank you. Okay. Thank you. All right. The cases will be submitted. The court is adjourned.